UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 50016 |
| vs. | ) | |
| | ) | Judge Matthew F. Kennelly |
| FLOYD E. BROWN | ) | |

**UNITED STATES' CONSOLIDATED MOTIONS IN LIMINE**

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following consolidated motions in limine.[1]

**I.      Motion in Limine #1: Admission of Statements by and to Deputy Marshals Leading up to the Attempted Attest of Defendant at the Extended Stay Hotel**

On March 7, 2019, Special Deputy U.S. Marshal Jacob Keltner, Special Deputy U.S. Marshal D.K., Special Deputy U.S. Marshal M.F, Deputy U.S. Marshal M.S., and Deputy U.S. Marshal A.C attempted to arrest defendant on outstanding warrants at an Extended Stay America ("Extended Stay") hotel in Rockford. Keltner, D.K., and M.F. were engaged in their official duties as Special Deputy U.S. Marshals assigned to the U.S. Marshal's Great Lakes Regional Fugitive Task Force (the "Task Force"), and M.S. and A.C. were Deputy U.S. Marshals whose official duties included assisting the Task Force.[2]

Deputy D.K. arrived in Rockford first and showed photographs of defendant and his girlfriend, D.W., to two Extended Stay employees. Both employees recognized D.W. and stated

---

[1] This motion consolidates several motions in limine. None of the incorporated motions exceeds 15 pages in length.

[2] Going forward, the Special Deputy U.S. Marshals and Deputy U.S. Marshals involved in the efforts to locate and arrest defendant at the Extended Stay hotel on March 7, 2019 are referred to as "Deputy" or "Deputy Marshal."

that she had been staying at the hotel with a male who did not leave the room frequently. The employees advised that D.W. and the male were staying in Room 305. Deputy D.K. relayed information he received from the hotel employees to the other Deputy Marshals involved in the operation via a group iMessage chat. All five Deputy Marshals involved in the operation were part of the group chat.

One of the Extended Stay employees, a maintenance man at the hotel, also provided Deputy D.K. with a description of defendant's vehicle and where the vehicle usually parked. Deputy D.K. relayed that information to the other Deputy Marshals via the group chat. At the time, Deputy Keltner and Deputy M.F. were together in a vehicle parked on the northeast side of the hotel. Deputy M.F. is expected to testify that they observed the vehicle the maintenance man described, and Deputy Keltner took a photograph of the vehicle with his cell phone and sent it to the group chat. Deputy D.K. showed the photograph to the maintenance man, who confirmed the photograph was of the correct vehicle.

The Deputy Marshals discussed via the group chat steps to confirm whether defendant was currently in Room 305. Deputy Keltner suggested that Deputy D.K. ask if one of the employees was willing to conduct a ruse visit to Room 305 to determine who was in the room. Deputy D.K. did so, and the maintenance man agreed to conduct the ruse visit.

As the maintenance man was preparing to conduct the ruse visit, the Deputy Marshals began to develop a plan on how to proceed if the maintenance man confirmed that defendant was in the hotel room. The plan included assigning each Deputy Marshal in the group chat to certain duties and coverage areas. Deputy Marshals updated each other via the group chat on their positioning. Deputy D.K. also updated the other Deputy Marshals on the progress and results of the ruse visit via the group chat.

2

The group chat began on March 7, 2019 at approximately 8:40 a.m., and the final message in the chat was sent at approximately 9:14 a.m. The government plans to offer in evidence a number of the group iMessages exchanged between the Deputy Marshals during this time period. The government will call Deputies D.K., M.F., M.S., and A.C. and the Extended Stay hotel's maintenance man as witnesses at trial. The government may also call the second Extended Stay hotel employee discussed above as a witness at trial.

The out-of-court group messages are admissible under the following theories of admissibility. First, many of the messages are not hearsay because they are directives or questions, rather than assertions. Fed. R. Evid. 801(a). For example, some messages simply contain acknowledgements that the previous message was received (*i.e.,* "Roger" or "Ok"). Others contained questions, *i.e.,* "Where do you wsnt [sic] me?" And others contained directions or requests addressed to the other Deputy Marshals in the chat, including "[M.S.] and [M.F.] can head up" and "We are good just have them hold so you can jock up". These messages do not contain hearsay and thus are not excluded from evidence by the rule against hearsay. Fed. R. Evid. 801, 802.

Second, several of the messages are admissible as present sense impressions because they contain statements describing or explaining an event or condition, made while or immediately after the declarant perceived it. Fed. R. Evid. 803(1). For example, in one message, Deputy M.F. stated, "We are on bc corner". (The Deputy Marshals are expected to explain that, in this context, "bc" meant northeast.) In another message, Deputy D.K. stated, "Roger. I have key. Going up for ruse now." Later in the chat, Deputy D.K. stated "Knocking now for ruse". These messages are admissible under the present sense impression exception to the rule against hearsay. Fed. R. Evid. 803(1).

Third, some of the messages should be admitted under the residual hearsay exception in Federal Rule of Evidence 807. Those statements are supported by "sufficient guarantees of trustworthiness . . . after considering the totality of the circumstances under which [they were] made and evidence, if any, corroborating the statement," Fed. R. Evid. 807(a)(1), because the statements are being exchanged contemporaneously with the Deputy Marshals attempting to locate and arrest defendant. The need for the Deputy Marshals to coordinate their activities and promptly share information as the operation was developing provides sufficient guarantees of trustworthiness similar to—and greater than—those underpinning the business records exception to the rule against hearsay. *See* Fed. R. Evid. 803(6).

To be admissible under the residual exception, the proposed evidence must be more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable methods. Here, the government seeks to introduce the iMessages primarily to establish the timing of the Deputy Marshals' actions. The Deputy Marshals and Extended Stay hotel employees who will be called as witnesses will testify about the substance and the sequence of events, but the times at which the iMessages were sent are likely more probative of the times at which those events occurred than the witnesses' knowledge or memory of those times.

The chart below lists the group iMessages that the government plans to offer in evidence and lists the basis for admissibility.[3]

---

[3] Empty rows designate times that the Deputy Marshals exchanged additional iMessages that the government does not plan to offer in evidence.

| Sender | Time | Content | Basis for Admissibility |
|--------|------|---------|-------------------------|
| Keltner | 8:41 am | [M.S.] can you put [A.C.] in your car and take the A/D corner (opposite [M.F.]) | 801, Non-hearsay |
| D.K. | 8:42 am | I'm working on room number and location in building | 807, Residual Clause |
| D.K. | 8:42 am | Slow service but cooperative | 803(1), Present sense impression 807, Residual Clause |
| | | | |
| D.K. | 8:55 am | They are putting together a ruse for the water leak | 807, Residual Clause |
| Keltner | 8:55 am | Ok | 801, Non-hearsay |
| D.K. | 8:55 am | He's willing to go now, unless you have objections I'll send him now | 803(1), Present sense impression 807, Residual Clause |
| Keltner | 8:56 am | No that's fine can you follow him and then keep an eye on the door? | 801, Non-hearsay |
| D.K. | 8:56 am | Yes | 801, Non-hearsay |
| Keltner | 8:57 am | Hasty plan....[A.C.] keep an eye on the door on that side, I will keep an eye on the window and this door and [M.F.] and [M.S.] can back [D.K.] up post haste if need be | 801, Non-hearsay |
| D.K. | 9:00 am | Roger. I have key. Going up for ruse now. | 803(1), Present sense impression 807, Residual Clause |
| A.C. | 9:00 am | OK we're at A.D. corner, to confirm. South end | 803(1), Present sense impression 807, Residual Clause |
| Keltner | 9:01 am | Yep | 801, Non-hearsay |
| | | | |
| D.K. | 9:06 am | I'll be in 304; it's vacant | 807, Residual Clause |
| Keltner | 9:06 am | We are on it | 801, Non-hearsay |
| D.K. | 9:08 am | Ok | 801, Non-hearsay |
| D.K. | 9:08 am | Knocking now for ruse | 803(1), Present sense impression 807, Residual Clause |
| Keltner | 9:08 am | [A.C] from you can you keep an eye on the front door and the side door? | 801, Non-hearsay |
| D.K. | 9:08 am | He's [the maintenance man] in room | 803(1), Present sense impression 807, Residual Clause |
| A.C. | 9:08 am | Yeah I can se [sic] both | 803(1), Present sense impression 807, Residual Clause |

| | | | |
|---|---|---|---|
| D.K. | 9:08 am | He's [the maintenance man] out | 803(1), Present sense impression<br>807, Residual Clause |
| Keltner | 9:08 am | [M.S.] and [M.F.] can head up | 801, Non-hearsay |
| D.K. | 9:09 am | He [the maintenance man] will text or call with result | 801, Non-hearsay |
| | | | |
| D.K. | 9:10 am | We can wait for some guys or go. Your call | 801, Non-hearsay |
| D.K. | 9:10 am | Idk what you need for outside | 801, Non-hearsay |
| Keltner | 9:10 am | We are good just have them hold so you can jock up | 801, Non-hearsay |
| Keltner | 9:10 am | By the room obviously | 801, Non-hearsay |
| D.K. | 9:10 am | Roger. | 801, Non-hearsay |
| M.S. | 9:11 am | On 3 now | 803(1), Present sense impression<br>807, Residual Clause |
| | | | |
| M.S. | 9:11 am | Where do you wsnt [sic] me? | 801, Non-hearsay |
| Keltner | 9:12 am | Room 304 is where dan is [REMAINDER REDACTED] | 801, Non-hearsay[4]<br>807, Residual Clause |
| M.F. | 9:12 am | Coming up | 803(1), Present sense impression<br>807, Residual Clause |
| D.K. | 9:12 am | I'm ready | 803(1), Present sense impression<br>807, Residual Clause |
| M.S. | 9:12 am | Ok going to 304 | 803(1), Present sense impression<br>807, Residual Clause |
| | | | |
| Keltner | 9:14 am | Dan let me know you are knocking so I get out on feet's | 801, Non-hearsay |

In addition to the electronic communications identified above, the government plans to

introduce certain out-of-court statements made by one or more Extended Stay hotel employees to

---

[4] Although this message, on its face, appears to be an assertion. In context, the message is advising Deputy M.S. where to go in response to Deputy M.S.'s question, and therefore is a directive rather than an assertion. The second part of the message, which is omitted in the above chart, stated "target is 305." Although this message also appears to be a directive regarding where Deputy M.S. should go, there is a greater risk that the jurors may rely on it for the truth of the matter. As a result, the government intends to redact this part of the message.

Deputy Kramer prior to the attempted arrest, not for the truth of the matter asserted but to explain why the Deputy Marshals took the actions they did. For example, the employees advised Deputy Kramer that D.W. and the male she was with were staying in Room 305, the maintenance man identified their vehicle in the parking lot, and the maintenance man sent a text message to Deputy Kramer after the ruse visit confirming that the male was in Room 305. These statements explain why the Deputy Marshals approached Room 305 when they attempted to execute the arrest warrant.

The danger of unfair prejudice from the admission of these statements to show why the Deputy Marshals took the resulting steps is minimal because the government plans to call the maintenance man as a witness too. And if the government introduces statements by the second employee, the government will call the second employee as a witness too. The defense will have the opportunity to cross-examine the employee witness(es) directly regarding their out-of-court statements and the bases of their knowledge, among other things. Under the circumstances, the jury is unlikely to improperly rely on Deputy D.K.'s testimony about what the employees told him for the truth of those matters because the jury will instead be able to assess the truth of the matters directly during the testimony of the Extended Stay employee(s).

For these reasons, the Court should permit the government to introduce the above statements made by or to the Deputy Marshals as they were in the process of locating and preparing to arrest defendant at the Extended Stay hotel.

## II.     Motion in Limine #2: Admissibility of D.W.'s Out-of-Court Statements

If D.W. is not called as a witness at trial, the government may seek to introduce certain statements D.W. made on March 7, 2019 as non-hearsay statements or based on well-established exceptions to the rule against hearsay.  First, the Deputy Marshals are expected to testify that after

Deputy D.K. first knocked on the door to Room 305, the Deputy Marshals heard a female inside the room ask, "Who is it?" This is a question, not an assertion, and, therefore, is not hearsay. Fed. R. Evid. 801.

Second, the Deputy Marshals are expected to testify that after they announced themselves as "U.S. Marshals" and announced that they had a warrant for Floyd Brown, they heard a male voice from deeper in the room warn, "Don't do it. Don't do it."[5] Deputy D.K. then used a hotel key card to open the door to Room 305. The swing lock of the door was engaged, however, so the door opened only a few inches. The female (later confirmed to be D.W.) came to the door and was partially visible to Deputy D.K. and Deputy M.S. The Deputy Marshals are expected to testify that D.W. was yelling that she wanted to get out and appeared to be panicked based on her statements, tone of voice, and facial expressions, among other things, and gunshots erupted from inside Room 305 seconds later. D.W.'s statement about wanting to get out of the room is admissible as an excited utterance, under Fed. R. Evid. 803(2), and a statement of D.W.'s then-existing state of mind, under Fed. R. Evid. 803(3).

Third, the government's evidence will show that D.W. was hit in the right arm by bullet fragments while defendant was shooting at the Deputy Marshals in the hallway. Medical imaging performed later that day confirmed that D.W. had three bullet fragments lodged in her right arm. After the shooting started, the Deputy Marshals in the hallway began moving away from Room 305 to find cover in the hallway. As they sought cover, the Deputy Marshals heard D.W., who was still inside the room, yell that she had been shot and was bleeding. The Deputy Marshals are

---

[5] In light of the strong evidence establishing that defendant was the other person in the room, this statement is admissible as a non-hearsay statement of an opposing party. Fed. R. Evid. 801(d)(2). But even without identifying the speaker as defendant, this statement is a directive, not an assertion, and therefore, is not hearsay. Fed. R. Evid. 801.

expected to testify that D.W. sounded like she was under distress at the time she made this statement. This statement is admissible as a present sense impression, an excited utterance, and a then-existing physical condition, under Fed. R. Evid. 803(1), (2), and (3), respectively.

Fourth, while law enforcement officers were seeking to clear the hotel of possible threats, law enforcement officers directed D.W. to exit Room 305. D.W. responded that she could not exit because the door lock had been shot and was jammed. This statement is also admissible under Fed. R. Evid. 803(1) as a present sense impression.

Fifth, after D.W. was eventually cleared from Room 305, she was transported by ambulance to a local hospital and treated for a gunshot wound to her right arm. The government may seek to introduce the statements D.W. made to the paramedics that transported her to the hospital. D.W. told the paramedics that the wound on her elbow was the result of a gunshot wound and that she was in pain in her entire right arm. These statements are admissible under Fed. R. Evid. 803(4) as statements made for medical diagnosis or treatment. The government may also offer in evidence, under Fed. R. Evid. 803(4), similar statements D.W. made to the medical personnel who treated her at the hospital.

None of D.W.'s statements that the government may seek to offer are testimonial. The primary purpose of the statements was to obtain emergency assistance or medical care, not to provide testimony in a criminal case. *See Davis v. Washington,* 547 U.S.C. 813, 822 (2006) ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."); *see also Ohio v. Clark,* 576 U.S. 237, 246, 249 (2015) (declining to adopt a categorical rule excluding statements to non-law enforcement officers from the Sixth Amendment's reach but recognizing that "[s]tatements made to someone who is

not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers"). Accordingly, the introduction of D.W.'s statements outlined above does not violate the Confrontation Clause.

### III. Motion in Limine #3: Motion to Admit Squad Car Video, Crime Scene Photographs, and Post-Mortem Photographs

The government intends to offer in evidence a squad car video from the first Rockford Police Department officer to respond to the Extended Stay hotel after Deputy A.C. called 911 to report shots fired at the hotel. The squad car video shows the responding officer, Officer Watson, pull into the front entry of the Extended Stay's parking lot at approximately 9:18 a.m. A hotel guest directed Officer Watson toward the north end of the building. At approximately 9:18:30 a.m., Officer Watson's squad car video first shows Deputy Keltner lying on the ground near the rear of Deputy M.F.'s vehicle. The squad car video provides key evidence of Deputy Keltner's approximate location when he was shot and the position of his body when he was found by the first responding officer.

The government also intends to offer in evidence various crime scene photographs to show where evidence was found and the general layout of the area. Neither Deputy Keltner nor D.W. are depicted in any of the crime scene photographs, although the photographs show areas of blood stains where Deputy Keltner and D.W. were shot. The blood stains visually demonstrate Deputy Keltner's and D.W.'s approximate locations when they were shot.

The government also intends to offer in evidence post-mortem photographs of Deputy Keltner taken at the hospital after and later during his autopsy. The forensic pathologist who conducted the autopsy determined that the cause of death for Deputy Keltner was a gunshot wound of the back involving the head. The entry wound was located on Deputy Keltner's upper back, and the exit wound was located behind Deputy Keltner's left ear. The post-mortem photographs that

10

the government intends to introduce will show Deputy Keltner's injuries and assist in demonstrating the trajectory of the bullet that killed him.

The visual evidence summarized above has immense probative value in that it demonstrates where and how Deputy Keltner was killed in a way that oral testimony alone does not. The visual evidence "can assist the jury in understanding the testimony of the medical examiner and provide a clearer picture of the victim's injuries, his cause of death, . . . and the defendant's malice aforethought." *United States v. Sheffler,* 2021 WL 5085342, at *3 (C.D. Ill. Nov. 2, 2021) (collecting cases). The visual evidence also will give the jury a greater understanding of the crime scene and, in turn, assist the jury in evaluating the evidence obtained from the crime scene as a whole. And the visual evidence will help "confirm the prosecution's theory about the manner in which the crime was committed." *Sheffler,* 2021 WL 5085342, at *3 (quoting *United States v. Rezaq,* 134 F.3d 1121, 1138 (D.C. Cir. 1998)).

The visual evidence summarized above, moreover, is not unfairly prejudicial. The crime scene photographs show blood, but do not include images of the victims' injuries. The squad car video shows Deputy Keltner lying on the ground unresponsive, but does not show the extent of Deputy Keltner's injuries. And, although the post-mortem hospital and autopsy photos do show Deputy Keltner's injuries, "that is simply reality, not unfair sensationalism." *See United States v. Briseno,* 88 F. Supp. 3d 849, 851 (N.D. Ind. 2015). The nature and location of his injuries is important evidence in establishing how Deputy Keltner was killed and, in turn, who killed him. And although some of the autopsy photographs may be disturbing, they are not so disturbing that they present a danger of unfair prejudice that substantially outweighs the significant probative value of the visual evidence. The squad car video, crime scene photographs, and post-mortem hospital and autopsy photographs should therefore be admitted.

## IV.     Motion in Limine #4: Motion to Exclude Irrelevant Second-Guessing of the Deputy Marshals' Attempted Arrest Plan

The government moves to preclude the defense from presenting—through testimony, arguments of counsel, cross-examination, or otherwise—irrelevant critiques or second-guessing of the Deputy Marshals' strategy regarding their attempted arrest of defendant at the Extended Stay hotel.

Relevancy is a fundamental hurdle that all admissible evidence must satisfy. Fed. R. Evid. 403 ("Irrelevant evidence is not admissible."). Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Though the standard for relevance is low, *see, e.g., United States v. Driggers,* 913 F.3d 655, 659 (7th Cir. 2019), a "defendant has no right either to cross-examine adverse witnesses, or to present defense witnesses to testify, regarding facts which are not 'of consequence' to the determination of the action . . . ." *United States v. Wiman,* 77 F.3d 981, 986 (7th Cir. 1996). Nor does a defendant have a right to present a defense that is unsupported by law. *See id.*

A common trial strategy used by criminal defendants is to point out purported deficiencies in the investigation and second-guess the choices made by investigating agents. While this can be a valid legal strategy with respect to the *investigation of* the charged offenses, employing a similar strategy directed toward the Deputy Marshals, who are the victims (not the investigators) in this case, has no support in the law. Evidence designed to criticize and second-guess the manner in which the Deputy Marshals attempted to arrest defendant—for example, by arguing that the Deputy Marshals should have waited for backup or maintained surveillance until defendant left the hotel on his own account before attempting to arrest him—does nothing to make a "fact of consequence" more or less probable in this case. Civilians are not legally permitted to assault and

attempt to kill federal law enforcement officers because of some perceived inadequacy in their operational planning. Because arguments and testimony regarding other strategies that the Deputy Marshals could have attempted do not make a fact of consequence in this case more or less probable, the defense should be precluded from making arguments or eliciting testimony on this subject. *See United States v. Wilk,* 572 F.3d 1229, 1235 (11th Cir. 2009) (finding no abuse of discretion in the district court's exclusion of post-mortem evidence showing that the victim officer had steroids in his blood because the evidence was not relevant to the charged offenses or defendant's defense to the charges); *see also Wiman,* 77 F.3d at 985 (finding no plain error in the district court prohibiting defendant "from making any reference through testimony, arguments of counsel or otherwise" about his strategy to argue that he had no choice but to commit the burglary so that he could get enough money to hire a lawyer to protect his molested daughter because the authorities refused to help him); *United States v. Shalash,* 11 CR 0627, 2013 WL 4820927, at *5 (N.D. Ill. Sept. 10, 2013) (granting motion to preclude evidence and argument regarding the defendant's family needs to the extent such evidence is designed to imply a motive or excuse for his criminal conduct or invoke sympathy).

Furthermore, even if defendant can establish that such evidence meets the threshold for relevancy, defendant must still clear the hurdle of Rule 403's balancing test. Presenting evidence regarding the perceived propriety of the Deputy Marshals' arrest strategy runs a high risk of unfair prejudice, confusing the issues for the jury, wasting significant time exploring a minimally, if at all, probative line of evidence.

### V.    Motion in Limine #5: The Victim-Witnesses' Right Not to Be Excluded Under the Crime Victims Rights' Act

Under Federal Rule of Evidence 615, a court can exclude a witness so that he/she cannot hear other witnesses' testimony. A motion for the exclusion of witnesses is traditionally made and

granted before the start of trial. A stricter standard applies, however, when a party is seeking to exclude a victim-witness because Rule 615 does not permit the exclusion of "a person authorized by statute to be present[,]" Fed. R. Evid. 615(d), and the Crime Victim Rights' Act ("CVRA") affords victims "[t]he right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convicting evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding." 18 U.S.C. § 3771(a)(3). The CVRA, in other words, abrogates Rule 615 with respect to crime victims. *See In re Mikhel,* 453 F.3d 1137, 1139 (9th Cir. 2006).

"A mere *possibility* that a victim-witness may alter his or her testimony as a result of hearing others testify" is insufficient to justify the victim-witness's exclusion from trial. *Id.* Rather, a district court must find "by clear and convincing evidence that it is *highly likely*, not merely possible, the victim-witness will alter his or her testimony." *Id.*; *United States v. Pirk,* 284 F. Supp. 3d 445, 449 (W.D.N.Y. 2018) (same). Although a crime-victim's right against exclusion is not unlimited, the CVRA provides that "[b]efore making a determination [to exclude a victim-witness], the court shall make every effort to permit the fullest attendance possible by the victim and shall consider reasonable alternatives to the exclusion of the victim from the criminal proceeding." 18 U.S.C. § 3771(b)(1).[6]

In this case, the government anticipates calling Deputy Marshals M.S., D.K., and M.F. as witnesses at trial. The Deputy Marshals are expected to testify regarding the events at the Extended Stay hotel, their status as federal officers, and their actions while engaged in official duties as federal officers on March 7, 2019. Although the areas of the victim-witnesses' testimony will

---

[6] A court must state the reasons for denying relief under the CVRA clearly on the record. *Id.*

largely overlap, this alone does not present clear and convincing evidence that it is highly likely the victim-witnesses will materially alter their testimony.

Each officer has been interviewed multiple times as part of this investigation, and those interviews have been (or are being[7]) documented by the FBI case agents. In addition, the government has turned over contemporaneous group iMessages sent and received by those witnesses on March 7, 2019, as detailed above. The government has also disclosed surveillance video from the Extended Stay lobby that shows some activity of the victim-witnesses and a recording of a 911 call that contains some additional statements made at the time of the events. In light of these disclosures, it is unlikely that the victim-witnesses' testimony will be materially altered if they heard other testimony at the proceeding. And any material changes in their accounts of the events likely would be raised during cross-examination.

Accordingly, the government's position is that the victim-witnesses—Deputy D.K., Deputy M.F., and Deputy M.S.—should not be subject to any compulsory order excluding witnesses at trial. If the Court determines that some exclusion of these victim-witnesses is necessary, § 3771(b)(1) requires the Court to make every effort to permit their fullest attendance possible. Thus, even if the Court finds that some exclusion of the victim-witnesses is necessary, their exclusion should be limited only to times when each other or Deputy A.C. (who participated in the operation but is not a victim of the charged offenses) is testifying.

## VI. Motion in Limine #6: Evidence and Argument Regarding the Penalties Defendant May Face if Convicted of the Charged Offenses

In many criminal cases, the government moves to preclude the defendant from introducing any evidence, making any argument, or otherwise mentioning the potential penalties faced by the

---

[7] Some interviews occurred recently and the reports of the interviews are currently being drafted. The reports will be disclosed to the defense promptly upon completion.

defendant, if convicted, of the charged offenses. This includes, but is not limited to, moving to preclude the defense from arguing to the jury, for example, not to send defendant away "for years," or "for life," or for some other specified amount of time based on the evidence presented.

The Seventh Circuit has held unequivocally that generally "arguing punishment to a jury is taboo." *See, e.g., United States v. Richardson*, 130 F.3d 765, 778 (7th Cir. 1997), *vacated on other grounds,* 526 U.S. 813 (1999); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997); *see also United States v. McKenzie*, 922 F.2d 1323, 1327 (7th Cir. 1991) (providing that "the sixth amendment requires that a jury determine questions of guilt or innocence; punishment is the province of the Court"). Unless a jury has a sentencing role, such as in cases involving capital offenses, it "should be admonished to reach its verdict without regard to what sentence might be imposed." *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quotations, footnotes, and citations omitted); *see also Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997) (noting that "the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored"). For example, the Seventh Circuit has considered and rejected a request to inform a jury of a mandatory minimum penalty in a narcotics case. *See Lewis*, 110 F.3d at 422 (reasoning that the jury had no sentencing function and no statute required the jury to be informed of the consequences of its verdict).

The Court should prohibit evidence of the potential penalties defendant faces, other than for the purpose of proving or refuting defendant's motive. The Seventh Circuit has unequivocally held that "arguing punishment to a jury is taboo." *See e.g., United States v. Richardson*, 130 F.3d 765, 778 (7th Cir. 1997), *vacated in part on other grounds*, 526 U.S. 813 (1999); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997); *see also United States v. McKenzie*, 922 F.2d 1323, 1327

(7th Cir. 1991) ("[T]he sixth amendment requires that a jury determine questions of guilt or innocence; punishment is the province of the Court."). Such argument or evidence concerning punishment is improper because the law is well-settled that the potential penalty faced by a defendant is irrelevant to the jury's determination of guilt or innocence. *See, e.g., Shannon v. United States*, 512 U.S. 573 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"). Furthermore, mention of the potential penalties faced by defendants would serve only the improper purpose of jury nullification. *See, e.g., United States v. Reagan*, 694 F.2d 1075, 1080 (7th Cir. 1982) ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial."); *United States v. Patterson*, No. 95 CR 242, 1996 WL 54237, at *1 (N.D. Ill. Feb. 8, 1996) (prohibiting discussion of potential penalties in order to avoid possible jury nullification).

Accordingly, any evidence or argument related to the potential penalties faced by defendant, if convicted, whether they invoke a specific reference to years or months of imprisonment, or general arguments and statements regarding the defendant's loss of liberty or freedom such as "the defendant is on trial for his life" or "the defendant's freedom hangs on the outcome of the jury's decision," should be prohibited.

## VII. Motion in Limine #7: Preclude Reference to the Death Penalty

The government moves to bar any reference to the death penalty in any way. The defendant was charged with capital-eligible offenses, namely Counts One and Seven. The Attorney General has elected not to seek the death penalty in this case. Therefore, any mention of, or argument about, the fact that the defendant once faced the potential of capital punishment would be irrelevant and unnecessarily confusing to the jury.

17

As noted above, informing juries about the "sentencing consequences of their verdicts is strongly disfavored." *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997). Unless a jury has a role in sentencing, such as in capital cases, jurors should be instructed not to consider the defendant's potential sentence during deliberations. *See Shannon v. United States,* 512 U.S. 573, 579 (1994). That's because in non-capital cases, the jury's function is to "find the facts," while the Judge's function is to impose sentence after the jury has arrived at a guilty verdict. *Id.* Further, providing the jurors with sentencing information "invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*

This is not a capital case and the jury has no role in sentencing. The mention of *any* potential penalties the defendant faces on the charged offenses would be inappropriate, so mention of the death penalty—a penalty that the government is not seeking and that defendant no longer faces—would be particularly irrelevant. Argument about the death penalty would not tend to make any fact at issue more or less probable. *See* Fed. R. Evid. 401. And any such argument poses a particular risk of confusion and of "distract[ing]" the jury from its "factfinding responsibilities," *Shannon*, 512 U.S. at 579, in this case, where that punishment is no longer at issue.

**VIII. Motion in Limine #8: Motion to Bar Forms of Argument or Evidence Designed to Elicit Jury Nullification**

The government moves this Court to preclude defendant from arguing, or otherwise presenting evidence or pursuing lines of inquiry designed to elicit jury nullification. The law is plain that it is improper for a defendant to suggest in any way that the jury should acquit defendant even if it finds that the government has met its burden of proof. *See, e.g., United States v. Laguna*, 693 F.3d 727, 730-31 (7th Cir. 2012) (district court properly excluded evidence because, among other reasons, it had the potential to invite nullification); *United States v. Perez*, 86 F.3d 735, 736

(7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly. Jury nullification is a fact, because the government cannot appeal an acquittal; it is not a right, either of the jury or of the defendant.") (citing *United States v. Kerley*, 838 F.2d 932, 938 (7th Cir. 1988), and *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993)); *see also, United States v. Bruce*, 109 F.3d 323, 327 (7th Cir. 1997) ("Jury nullification 'is not to be positively sanctioned by instructions,' but is to be viewed as an 'aberration under our system.'") (quoting *United States v. Anderson*, 716 F.2d 446, 450 (7th Cir. 1983)).

Although the government is unable to anticipate each form of "jury nullification" argument or evidence that defendant may seek to interject into this trial, the government notes at least the following common examples of jury nullification.

### A. Claims of Selective or Vindictive Prosecution

The government seeks to bar any evidence or claims of an improper prosecution, such as selective or vindictive prosecution. These claims provide no defense to the criminal charges and are not relevant to the merits of the charge.

As the Supreme Court has plainly stated, "[a] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). "In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" *Id.* at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). Accordingly, evidence bearing on the government's decision to prosecute is "extraneous and collateral" and, thus, properly excluded from trial. *United States v. Johnson*, 605 F.2d 1025, 1030 (7th Cir. 1979)

(affirming the exclusion of evidence offered to show that the "indictment was a political instrument").

Because claims of alleged misconduct on the part of the prosecutor or investigating agents are irrelevant to the merits of criminal cases, suggesting to the jury that alleged misconduct provides a basis for acquittal is an invitation for the jury to nullify. Because such allegations are irrelevant to the jury's decision and serve no purpose other than to distract the jury from legally relevant matters, they merely invite the jury to acquit the defendant without regard to admissible evidence. To the extent defendant wishes to raise these issues, he must raise them with the Court, not the jury. *See United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (finding that "the issue of selective prosecution is one to be determined by the court"); *United States v. Jarrett*, 705 F.2d 198, 204-05 (7th Cir. 1983) (finding claims of selective prosecution must be raised before trial).

To date, defendant has filed no pretrial motions claiming selective or vindictive prosecution, the only proper way of resolving such a claim. Accordingly, evidence and argument at trial related to these issues, in any form, should be barred by the Court as an attempt at jury nullification.

### B. Argument or Evidence of "Outrageous Government Conduct"

Similar to arguments related to selective prosecution, the Court should preclude any evidence or argument related to so-called "outrageous government conduct." The Seventh Circuit repeatedly has held that "[o]utrageous government conduct is not a defense in this circuit." *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011) (citation omitted).

There is an "increasing tendency in criminal cases to try some person other than the defendant and some issues other than his guilt." *United States v. Griffin*, 867 F. Supp. 1347, 1347 (N.D. Ill. 1994) (internal citation omitted). The "thrust of the defense" in these types of cases "is

20

this: the prosecution was not nice or could have done it better and so the jury ought to acquit, whether or not guilt has been proved beyond a reasonable doubt." *Id.* at 1347. In the face of this increasing tendency to interject themes of "government misconduct" into a defense strategy, courts routinely have granted motions in limine "to bar defendants from presenting evidence or making arguments to the jury suggesting that they should be acquitted because the government engaged in misconduct in the course of its investigation." *United States v. Shields*, 90 CR 1044, 1991 WL 236492, at *3 (N.D. Ill. Aug. 13, 1991); *see also United States v. Finley*, 708 F. Supp. 906, 913-14 (N.D. Ill. 1989) (granting motion in limine to preclude evidence "which is not relevant to defendants' guilt but is designed only to persuade the jury that defendants should be acquitted because the government engaged in misconduct during its investigation"); *United States v. Boender*, No. 09 CR 186-1, 2010 WL 811296, at *3 (N.D. Ill. March 3, 2010) ("The Seventh Circuit does not recognize an outrageous government conduct defense: the doctrine is more than moribund—it is stillborn because it never had any life; and it certainly has no support in the decisions of this court, which go out of their way to criticize the doctrine.").

The impropriety of arguing allegations of governmental misconduct to the jury is twofold. First, the "outrageous government conduct" argument affords no defense to a criminal prosecution as a matter of law. *See United States v. Sherman*, 268 F.3d 539, 549-550 (7th Cir. 2001) (providing "defense of outrageous government conduct does not exist in this circuit"); *see also United States v. Boyd*, 55 F.3d 239, 241-42 (7th Cir. 1995). The Seventh Circuit in *Boyd* held that "outrageous government conduct" is no defense to a criminal charge, and thus the jury should not be exposed to these irrelevant allegations. *Id.* Second, even before the *Boyd* decision, the Seventh Circuit held that the issue of government misconduct was a matter of law for determination by the court: "[T]he issue of outrageous government conduct is not an issue for the jury." *United States v. Swiatek*, 819

F.2d 721, 726 (7th Cir. 1987) (noting that every circuit which has considered the issue has held that the issue is not a jury question).

Accordingly, the government moves to bar the defense from introducing evidence or argument of outrageous government conduct. Should defendant plan to elicit evidence or argue during his opening statement or closing argument that the government's conduct was somehow outrageous, wrong, or inappropriate—whether with respect to this particular investigation and prosecution, or that law enforcement and prosecutors, more generally, are somehow acting in an outrageous or inappropriate manner when executing their professional duties—the government contends that the defense must first address the matter to the Court beforehand because it is a matter for the Court, and not the jury, to decide. *See United States v. Bontkowski*, 865 F.2d 129, 132 (7th Cir. 1989) (providing that, if the outrageous government conduct defense exists, "it is for the trial court, not the jury, to decide whether government conduct is so outrageous that due process bars the use of the judicial system to obtain a conviction.").

### C. Argument or Questioning about the Motivation for Investigating or Prosecuting this Case

The government moves to preclude evidence or argument by the defense regarding the government's and the investigating agencies' motivations for prosecuting the case, including subjective motivations of the officers and agents. Evidence bearing on the government's decision to prosecute is "extraneous and collateral" and thus excluded from trial. *Johnson*, 605 F.2d at 1030; *see also United States v. Berrigan*, 482 F.2d 171, 174-76 (3d Cir. 1973) (affirming exclusion of evidence relating to "discriminatory prosecution"). Inquiries regarding the subjective intentions or motivations of a government agent are irrelevant when making the factual determination of a defendant's guilt or innocence. *United States v. Goulding*, 26 F.3d 656, 667 (7th Cir. 1994) (noting that, even in the context of an entrapment defense, it was proper for the trial court not to "allow

the defense to mount an inquiry into the mental states of the investigating officers since such an inquiry was irrelevant"); *Katz*, 1992 WL 137174, at *7 (granting government's motion in limine to preclude inquiry regarding "[t]he subjective intentions or motivations of the agents involved in this case").

Accordingly, the government moves to preclude evidence or argument by the defense regarding the government's and the investigating agencies' subjective motivations for investigating or prosecuting the instant case.

### IX.     Motion in Limine #9: Motion to Preclude Requests or Commentary Concerning Discovery in the Presence of the Jury

The government respectfully moves this Court to preclude defendant from requesting discovery, moving the Court for discovery, or otherwise commenting on discovery matters in the presence of the jury.  Addressing discovery issues in front of the jury is inappropriate and may create the impression that one side has suppressed information as a means of seeking an unfair advantage. Discovery requests by defendant, if appropriate, can easily be made to the government or the Court outside the presence of the jury with no prejudice to either side. See, e.g., *United States v. Gray*, No. 07 CR 166, 2010 WL 1258169, at *3 (N.D. Ind. Mar. 26, 2010) (granting government's motion to preclude the defense from requesting or commenting on discovery in the presence of the jury).

### X.     Motion in Limine #10: Preclude Questions or Arguments Regarding Defendant's Prior Motion for *Franks* Hearing

Defendant previously filed a motion for a *Franks* hearing arguing that the Court should hold a *Franks* hearing relating to the March 4, 2019 affidavit submitted to a McLean County Circuit Court judge in support of an application for a warrant authorizing the installation and monitoring of a pen register and trap and trace device and the obtaining of prospective location

information for the -9123 phone—which is defendant's cell phone but, at the time, was believed

to be used by D.W. The Court denied defendant's *Franks* hearing and request to suppress evidence

obtained through the challenged warrant and any fruits of that evidence.

The Court should prohibit the defendant from relitigating the legal issues already decided

by the Court regarding the *Franks* hearing request and suppression of evidence. Such issues are

for the Court, not the jury, to decide. *See United States v. Teslim*, 869 F.2d 316, 324 (7th Cir.

1989). This Court previously decided the motion. Accordingly, the Court should prohibit any

argument or questioning by the defendant that attempts to relitigate or reopen the arguments raised

in his motion for a *Franks* hearing.[8] *See, e.g.*, *United States v. Hogsett*, 2006 WL 3692456, at *2

(S.D. Ill. Dec. 13, 2006).

## XI.  Motion in Limine #11: Motion to Admit Certain Convictions Pursuant to Federal Rule of Evidence 609

The government hereby notifies this Court and defense counsel of the following prior

convictions for defendant which may fall under the province of Federal Rule of Evidence 609(a):

i.   On or about March 22, 2013, defendant was convicted in Macon County Circuit Court of three counts of residential burglary and was sentenced to 13 years' imprisonment on each count, to be served concurrently.

ii.   On or about March 6, 2014, defendant was convicted of six counts of residential burglary in McLean County Circuit Court and was sentenced to 10 years' imprisonment on each count, to be served concurrently with each other and concurrently with the sentence imposed in Macon County Circuit Court.

Federal Rule of Evidence 609(a) provides that evidence that the defendant has been convicted of

a crime punishable by more than one year of imprisonment must be admitted for impeachment

purposes if the district court determines that the "probative value of the evidence outweighs its

---

[8] The government does not plan to call the affiant of the March 4, 2019 affidavit that defendant challenged as a witness at trial.

prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B). "[A] prior felony need not have involved 'inherent dishonesty' to be probative and admissible under Fed. R. Evid. 609(a)(1)." *United States v. Nururdin*, 8 F.3d 1187, 1192 (7th Cir. 1993); *see also United States v. Evans*, No.09 CR 152, No 2010 WL 2104171, at *5 (N.D. Ill. May 25, 2010) ("[T]hat a defendant's prior conviction did not involve dishonesty does not render that conviction inadmissible.") (citing *United States v. Causey*, 9 F.3d 1341, 1344 (7th Cir. 1993)).

The Seventh Circuit has established a five-part test for determining when the probative value of a prior conviction outweighs its prejudicial effect. Under this analysis, the district court should consider (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness's subsequent history; (3) the similarity between the past and present crime; (4) the importance of the defendant's testimony; and (5) the centrality of credibility in the trial. *United States v. Montgomery*, 390 F.3d 1013, 1015 (7th Cir. 2004).

In the instant case, the probative value of the defendant's prior convictions outweighs their prejudicial effect. First, defendant's prior convictions are either less than ten years old or defendant was released from confinement for the convictions within the last ten years. *See* Fed. R. Evid. 609(b)(1). Second, defendant's prior convictions for burglary are not similar to his current offenses of murder, attempted murder, assault, use of a firearm during a crime a violence, possession of a firearm with an obliterated serial number, and felon in possession of a firearm. While they are similar to the charges that led to the outstanding arrest warrants the Deputy Marshals were attempting to execute, this similarity does not substantially increase the prejudicial effect because the jury likely will be advised through the Court's limiting instructions to consider the outstanding warrants only for specific purposes.

Finally, with regard to the fourth and fifth factors, if defendant testifies, the government anticipates that he will deny murdering Deputy Keltner and/or deny that the killing was murder in the first degree. The government does not anticipate calling a witness who will testify that he/she saw defendant shoot Deputy Keltner. Defendant's testimony will speak to the core issues in the case, and defendant's credibility will be centrally important. *See United States v. Gant*, 396 F.3d 906, 910 (7th Cir. 2005) (finding the district court did not abuse its discretion in admitting defendant's prior convictions for impeachment purposes because "given Gant's theory of the case, his credibility was a crucial part of the trial."); *Nururdin*, 8 F.3d at 1192 (finding prior conviction admissible where the trial court found defendant's testimony and the credibility issue "are both critical to the outcome of this case because defendant and the officers offered conflicting accounts of the events leading to defendant's arrest."); *Causey*, 9 F.3d at 1344 (finding the district court's decision to allow impeachment on prior conviction reasonable where "credibility would be centrally important"); *United States v. Boyce*, No 10 CR 533, 2011 WL 5078186, at *5 (N.D. Ill. Oct. 26, 2011) ("If Boyce testifies, plotting his story against the officers' version of the relevant events, his testimony will speak to the core issue in the case."). Moreover, because the government must prove as part of the felon-in-possession charge alleged in Count Five that defendant had a prior felony conviction and knew of his felon status, the jury necessarily will hear during trial evidence that the defendant has a prior felony conviction. This diminishes the risk of prejudice in using defendant's burglary convictions for impeachment purposes if defendant testifies at trial. *Boyce*, 2011 WL 5078186, at *5.

## **CONCLUSION**

For the reasons explained above, the government respectfully requests that the Court grant the motions in limine identified above. The government is submitting an additional motion in limine pertaining to potential Rule 404(b) evidence in a separate filing.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

BY:   /s/ Talia Bucci
TALIA BUCCI
SCOTT PACCAGNINI
RONALD DEWALD
Assistants United States Attorney
327 South Church Street, Suite 3300
Rockford, Illinois 61101
(815) 987-4444

## CERTIFICATE OF SERVICE

I, TALIA BUCCI, hereby certify that, on January 25, 2022, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, N.D. Ill. Local Rule 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

## UNITED STATES' CONSOLIDATED MOTIONS IN LIMINE

was served pursuant to the district court's ECF system as to all ECF filers.

Respectfully submitted,

By:    /s/ Talia Bucci
TALIA BUCCI
Assistant United States Attorney
327 South Church Street, Suite 3300
Rockford, Illinois 61101
(815) 987-4451
talia.bucci@usdoj.gov

28